## D. W. COOLEY v. D. W. HATCH ET AL.

May Term, 1923.

Present: WATSON, C. J., POWERS, TAYLOR, SLACK, and BUTLER, JJ.

Opinion filed May 7, 1924.

*Exceptions to Master's Report Filed Out of Time—Adverse Decree as Implied Overruling of Exceptions—Statute of Frauds—In Verbal Contract for Sale of Land—Defense of Statute May Be Waived—Compromise and Settlement—Consideration—Part Performance—Contracts—When Time Not of the Essence of Contract—Vendor and Purchaser—Rescission of Contract for Sale of Land—Decree for Specific Performance—Costs—Discretion of Chancellor.*

1. In a suit in equity, exceptions to the original report of a special master in chancery, filed after the case had been appealed to the Supreme Court, remanded therefrom, and a supplemental report made by the special master, are out of time, and will not be considered by the Supreme Court.

2. In a suit in equity, heard on the facts of record and defendants' exceptions to the supplemental report, a decree by the chancellor that the plaintiff was entitled to specific performance as prayed for, etc., impliedly overruled such exceptions.

3. Although a verbal contract, in part for the sale of land and inseparable, was within the Statute of Frauds, such statute affected only the remedy, and as the vendors were not obliged to avail themselves of the benefit of its protection to avoid their undertaking, if they chose to recognize the contract without claiming such protection, it was good against them.

4. Where the single remaining active member of a partnership after its dissolution, refused to comply with the terms of a contract previously made by the partnership with the plaintiff, and the latter thereupon threatened such remaining partner with suit unless he would do something about the matter, and thereupon a second agreement was made whereby the liability of the firm was discharged and a new liability of the remaining partner

was created, such compromise agreement was upon sufficient consideration.

5. The acts of a party to a contract with a partnership in surrendering such agreement as settled and discharged, and all his claims under it against the partnership, and in entering into a substitute agreement, having in some respects materially different terms, with the single remaining active partner after dissolution of the partnership, were acts done in the execution of the new agreement and in part performance of it, and, in equity, took the case out of the operation of the Statute of Frauds.

6. In a contract to install a pump and engine, *held* that neither its express provisions, nor the nature and circumstance of the contract made time the essence of the contract.

7. Where an agreement for the sale and purchase of land, to be paid for partly in cash and the remainder by installation of a pump and engine, stipulated that the cash payment was to be made upon the tender to purchaser of a good and sufficient deed to the land, the pump and engine to be installed thereafter, the vendor, having failed to make such tender, had no right to rescind the contract, and his attempts to do so by tendering back to purchaser a cash payment made by him were ineffective.

8. Where a partner by agreement with plaintiff substituted his own contract for that of a previously existing contract of the partnership to sell the plaintiff certain land, and thereby the firm was discharged from liability, such partner, not being able to place the plaintiff in *statu quo* under the first contract, could not, without the plaintiff's consent, make rescission of the second contract.

9. In a suit in equity for specific performance of a contract to convey land on which there was a mortgage held by a bank, and to redeem from such mortgage, a decree against such mortgagee was warranted, where the special master had found facts justifying the chancellor in concluding that such mortgagee had promised the defendant vendor to release the land from the mortgage to permit a clear title to be conveyed, although such finding might not have the force of a binding contract, as it will not be assumed that the mortgagee will not act accord-

ing to the finding, and, if its position is otherwise, the plaintiff could take advantage of his right to redeem.

10. In such case, while the contest had been waged on questions entirely independent of the mortgage or rights under it, and while the bank, as mortgagee, was a necessary party when the bill was in part to redeem, and, under the ordinary rule, entitled to its costs, the chancellor did not abuse his discretion in allowing costs against such mortgagee, where it had largely co-operated with defendant vendor in such contest throughout.

APPEAL IN CHANCERY. Bill to enforce specific performance of a contract for the sale of real estate. Heard on a special master's original and supplemental reports at the September Term, 1922, Washington County, *Fish,* Chancellor. Decree for plaintiff awarding specific performance of contract as prayed for. The defendant appealed. The opinion states the case. *Affirmed, and remanded with directions.*

*E. A. Ayers* and *Harry C. Shurtleff* for the defendants.

*Theriault & Hunt* and *Edward H. Deavitt* for the plaintiffs.

WATSON, C. J. When this case was here before (91 Vt. 128, 99 Atl. 784) the record showed that prior to the making of the agreement in issue, the plaintiff had an oral contract (hereinafter called the first contract) with defendant Hatch and one Borden who were partners, when it was made, for the erection of a pump and engine in Shipyard Bay, and the conveyance of the lots in question to the plaintiff; that within the pendency of this contract the partnership was dissolved and Hatch refused to permit the plaintiff to carry out the contract which the partner Borden had made for the firm; and that to effect an adjustment of that contract on which the plaintiff was pressing Hatch, the agreement in issue was entered into as a substitute therefor. Nothing more concerning the first contract was shown by the record then before this Court; but the plaintiff contended that there was such a settlement and adjustment of his claim and surrender of his rights under it that now to permit Hatch to set up the Statute of Frauds would make that statute an instrument of perpetrating, rather than preventing, frauds; and that he is in

equity estopped from doing so, since the plaintiff cannot be placed in *statu quo* as respects the first contract. Thereon we said there were not sufficient facts reported touching that contract to enable the Court to determine the soundness of plaintiff's contention in the respect named.

The Court stated that the last named question had been considered, though based on facts outside the bill, because, if the acts of part-performance, there discussed, be deemed such as in equity to warrant a decree of specific performance notwithstanding the statute, the necessary amendment to the bill would be permissible, to prevent a miscarriage of justice. The *pro forma* decree dismissing the bill was affirmed and cause remanded.

[1, 2]  On remand, the bill being amended and further hearing had before the special master, additional facts were found and reported touching the question of time of the agreement in issue, and also touching the first contract, the settlement and adjustment of plaintiff's claim, and surrender of his rights, thereunder. Defendant filed numerous exceptions to the supplemental report, and three exceptions to the original report. The latter exceptions were out of time and are not noticed further. See *Hooker, Corser & Mitchell Co.* v. *Hooker*, 89 Vt. 383, 95 Atl. 649. The case being heard on the facts of record and the exceptions to the supplemental report, a decree was entered by the chancellor that the plaintiff is entitled to specific performance as prayed for, etc.—thus impliedly overruling the exceptions. On defendants' appeal from the decree, the case is now here.

The last named exceptions are all based on the Statute of Frauds, the statute also being one ground of defense claimed on the facts appearing of record; and another ground presented in argument is that of non-performance by plaintiff.

Respecting the first contract and the settlement and adjustment of the same, the supplemental report states that defendant Hatch and Wilbur R. Borden purchased the real estate described in the original report, including the Shipyard Bay and the lots in controversy, taking title thereto under two deeds running to them as tenants in common; that Hatch and Borden thereupon entered into a partnership for the purpose of developing the Shipyard Bay property and selling lots therefrom for camping purposes; that lots there situated were sold by the firm to divers persons, the same being negotiated by Borden as the partner

actively engaged in the business; that the acts of Borden in the sale of those lots, and in the original negotiations and agreement with the plaintiff, were within the scope of the partnership business, and therein Borden was acting as partner and for the partnership; that as between the two partners, Borden had particularly in charge the conduct of the partnership real estate enterprise, Hatch being out of the State for the most part during the period covered by the transactions in question; that in 1912 Borden, acting for the partnership, entered into an arrangement with one Campbell, a real estate agent residing in Waterbury, whereby the latter undertook to sell lots at Shipyard Bay on commission; that through this agent the plaintiff became interested in the lots, and during the summer of 1912, the two met Borden at Highgate Springs, at which time and place the first contract was negotiated; which contract was in substance that, in consideration of the sale and conveyance by Borden and Hatch to the plaintiff of certain lots at Shipyard Bay, being the same lots described in the original report, plaintiff undertook and agreed to install at Shipyard Bay, on lands of Borden and Hatch, a water system consisting of a seven horse power gasoline engine, a two-inch centrifugal pump, a wooden tank for the storage of water, and a line of pipe from the pump to the tank, the engine and pump to be installed on the lake shore and the tank on the top of the hill, thereby making a gravity water system for the use of cottages at Shipyard Bay; and the plaintiff was also to move from one of said lots a cottage thereon known as the Cedar Cottage, and upon receipt from Borden and Hatch of a clear warranty deed of said lots he was to pay them one hundred dollars; that it did not appear from the evidence that any definite time when the water system should be installed was agreed upon; but it was tacitly if not expressly understood that it should be done the following spring; but as few of the cottages, prospectively to be served by the system, had been built in 1912, Borden gave plaintiff to understand there was no hurry about the work, and that Borden should notify plaintiff when he was ready for it. At the time this contract was made, Borden had with him a blue print (made an exhibit in the case) which was a survey of a portion of the Borden and Hatch property. Borden and the plaintiff looked over the lots, agreed where the corners should be, and afterwards the parcel was staked out and notches cut in the

rocks.   This agreement thus entered into was talked over between Borden and Hatch at the time plaintiff made his proposition, and was agreeable to Hatch; and after the agreement was consummated, Borden discussed it again with Hatch who made no objection to it.   The master states that so far as the record shows the agreement was satisfactory to Hatch until the dissolution of the partnership between him and Borden.   The water system contemplated by the first agreement was entirely different from that involved in the second agreement, the one in issue.

In preparation for the performance of the first contract on his part plaintiff purchased a gasoline engine at a cost of $150.00, a pump at a cost of $18.00 together with freight charges thereon, a belt for the engine at a cost of between $14.00 and $15.00, pipe at a cost of about $75.00, and kept them in storage at an expense of $10.00 awaiting notice to begin the work of installation.

Plaintiff never received any such notice from Borden or the partnership.   On two or three occasions plaintiff gave Borden to understand that he was ready to begin work, but Borden assured him that there was no particular hurry about installing the system because the cottages to be served thereby had not been built.   Finally, in July, 1913, trouble between Borden and Hatch resulted in a dissolution of the partnership.   The two then discussed the matter the firm had pending with the plaintiff, Borden asking Hatch what he was going to do about it, the latter replying that he would look after it.   On the dissolution, Borden gave Hatch a warranty deed of his individual one-half interest in the Highgate Springs Point property so-called, dated the 24th day of June, 1913, and later, a quit-claim deed of his interest in the Shipyard Bay land, dated the 19th day of July, following.   The latter deed included the land covered by the agreement then existing between the firm and the plaintiff—the first contract.

After the partnership was dissolved plaintiff was informed by Hatch that he refused to carry out the foregoing agreement, stating the sole reason that the lots had been sold too cheap. Plaintiff then told Hatch what expense he had been to in preparing to perform the agreement, and that unless Hatch was willing to do something he, the plaintiff, should take action to collect damages; and thereupon, by way of adjusting and settling the plaintiff's claim under that agreement, and as a substitute therefor, the plaintiff and Hatch entered into the second agree-

ment, the one here in issue. ·The lots in question are reasonably worth at least one thousand dollars. In the negotiations between plaintiff and Borden it was understood and agreed that the consideration for the sale of the lots was six hundred dollars, of which five hundred dollars was to be liquidated by the installation of the water system and the removal of the Cedar Cottage, and one hundred dollars in money.

Besides the expense incurred by plaintiff in the purchase of material and the storage thereof, under the first agreement, as stated above, he sustained expense by way of travel, telephone tolls, loss of time on trips to Highgate and Swanton, aggregating $36.20. The engine and pump purchased by him under the first agreement were unlike those provided by him under the second agreement.

[3] Although the first contract, being verbal and in part for the sale of land and inseparable, was within the Statute of Frauds, yet, as the statute affected only the remedy upon it, the partners were not obliged to avail themselves of the benefit of its protection to avoid their undertaking. If they chose to recognize the contract without claiming such protection, it was good against them. Browne St. Frauds (5th ed.) § 135. This they both did so long as the partnership continued, and also thereafter until the time when Hatch, the remaining active partner, refused to carry out the contract as stated above, not because of the non-compliance with the requirements of the statute, but for the asserted reason that the lots had been sold too cheap.

Just what Hatch meant when he told Borden, at the time of the dissolution of the partnership, that he would look after the "Cooley matter," or what Borden understood him to mean, is not clear. But their understood meaning of that expression is of no consequence in the determination of this case; for the record contains nothing on which it can be said as matter of law that both partners were not liable on their contract with plaintiff in the same way and to the same extent after the dissolution as before, until the making of the agreement in issue with plaintiff by Hatch alone.

[4] That the latter agreement was entered into in compromise and settlement of a doubtful claim put forth in good faith by plaintiff, there would seem to be no doubt. Hatch refused to carry out the first contract for the reason by him stated;

whereupon plaintiff threatened him with an action for damages unless he was willing to do something. With this controversy existing between them, based on such refusal by one, and threat of litigation by the other, the second agreement was entered into. Thereby the liability of the whole firm was discharged, and a new liability of the single remaining active member of the firm was created by a substitute agreement. *Hard* v. *Burton*, 62 Vt. 314, 20 Atl. 269; *Rawson* v. *Taylor*, 30 Ohio St. 389, 27 A. R. 464. This compromise agreement was therefore upon sufficient consideration, (*Babcock* v. *Hawkins*, 23 Vt. 561; *McCloy's Admx.* v. *Watkins*, 88 Vt. 457, 92 Atl. 968,) and operated in law as a full satisfaction and discharge of the former contract, and all liability under it. Consequently any subsequent remedy of the parties, with reference to the subject-matters thereof, necessarily had to be based on the new agreement. *Babcock* v. *Hawkins*, *supra; Hard* v. *Burton*, *supra; Boston & Maine R. R.* v. *Union Mutual Fire Ins. Co.*, 83 Vt. 554, 77 Atl. 874.

[5] The acts of plaintiff involved in entering into the compromise agreement, namely, in legal effect, the surrendering as settled and discharged the first agreement and all his claims under it against the partnership, and entering into the substitute agreement with Hatch alone, having in some respects materially different terms, were acts done in the execution of the new agreement and in part performance of it. Pom. Specif. Perf. 157; *Parker* v. *Smith*, 1 Coll. Ch. 608. The case here cited is much in point. There the lease of a colliery was in the name of a firm of four partners, two of whom were sons of the lessor. The latter agreed by parol to grant a new lease at reduced rent on condition that the old lease be surrendered, and two of the partners retire from the business. Accordingly the two partners retired, and the old lease was surrendered. The case was heard before Vice-Chancellor Knight Bruce who said: "It is impossible to treat these acts otherwise than as acts of part-performance, taking the case out of the Statute of Frauds." The acts of the plaintiff mentioned above were direct acts intended to be a substantial part performance of the obligations created by the agreement then made and now in issue; they were acts which would not have been done but for that agreement; and the plaintiff was induced to alter his position on the faith of the agreement, to such an extent that it would be a fraud on the part of Hatch

to set up its invalidity. In such circumstances courts of equity hold that such acts of part performance will take the case out of the operation of the statute. *Williams* v. *Morris*, 95 U. S. 444, 24 L. ed. 360. In *Townsend* v. *Vanderwerker*, 160 U. S. 171, 40 L. ed. 383, 16 Sup. Ct. 258, the Court, speaking through Mr. Justice Brown, said: ''The general principle to be extracted from the authorities is that if the plaintiff, with the knowledge and consent of the promisor, does acts pursuant to and in obvious reliance upon a verbal agreement, which so change the relations of the parties as to render a restoration of their former condition impracticable, it is a virtual fraud upon the part of the promisor to set up the statute in defense and thus to receive to himself the benefit of the acts done by the plaintiff, while the latter is left to the chance of a suit at law for the reimbursement of his outlays, or to an action upon a *quantum meruit* for the value of his services.'' To the same effect is *Riggles* v. *Erney*, 154 U. S. 244, 38 L. ed. 976, 14 Sup. Ct. 1083, also our own case of *Stark* v. *Wilder*, 36 Vt. 752, both of which cases were particularly noticed in the opinion of the Court when this case was here before; but because a like specific notice of them at this time would be substantially a repetition, we let a simple reference to them suffice.

[6] It is contended that as to defendant Hatch the plaintiff has not proved performance of his part of the contract, and so under well established principles has not made out a case entitling him to specific enforcement. The contract was entered into on or about October 2, 1913. The master finds that the only substantial disagreement with respect to its terms relates to the time when the plaintiff was to install the pump and engine. As to this the findings are that he was to erect the foundation and make the installation as soon as he had completed a contract with the Eastern Talc Company for the construction of a railroad in the town of Rochester, Vermont, in which he was engaged at the time the contract in question was made; but that it was the understanding of both parties that the railroad contract would be completed in season to enable him to install the pump and engine under satisfactory conditions during the fall of 1913; and it was agreed that the plaintiff should make the cash payment stipulated for upon tender of a good and sufficient deed of the lot in question, and that the pump and engine should be installed after

such delivery of the deed and payment of the money.   In view of such indefinite provisions, it is clear that time is not of the essence of the contract.   It was not made so by the parties expressly, nor did it necessarily follow from the nature and circumstances of the contract.   2 Story Eq. Jur. (9th ed.) § 776; *Burton* v. *Landon*, 66 Vt. 361, 29 Atl. 374.

[7, 8]   On December 2, 1913, Hatch, through his agent, gave to Campbell (the real estate agent) an order on plaintiff for twenty-five dollars, with direction in the order to "charge the same to the cash price you are to pay for the lot."   This order was paid by plaintiff December 4.   The parties continued to treat the contract in question as existing and in force until Hatch attempted to rescind it by letters written by his agent Tillotson to plaintiff on February 24 and March 25, 1914.   Shortly after receiving the letter of the latter date and about the first of April, the plaintiff had a talk with Tillotson at Highgate Springs regarding the contract, tendering performance thereof on his part, including the payment of the unpaid balance in cash.   On the same occasion Tillotson tendered back to plaintiff the twenty-five dollars paid by the latter on the order to Campbell and interest thereon, but plaintiff declined to receive it.   While Tillotson wrote a letter to plaintiff as early as October 17, 1913, saying, "We have the deed all ready for you," in fact no deed was ever executed by Hatch, and no such deed was ever tendered by him or his agent to the plaintiff.   Consequently there was no default on the part of the latter affording Hatch the right to rescind the contract, and his attempts in this respect, without plaintiff's assent, were but ineffective efforts.   And further, Hatch could not make such a rescission because he could not place the plaintiff in *statu quo* under the first contract.   *Allen* v. *Edgerton*, 3 Vt. 442; *Fay* v. *Oliver*, 20 Vt. 118, 49 A. D. 764; *Hammond* v. *Buckmaster*, 22 Vt. 375.

[9]   It is said in defendant's brief that the decree is not warranted as against defendant Swanton Savings Bank & Trust Company, because there is no finding of a contract by the latter, as there must be before a decree can be rendered affecting its rights.   The master finds that, "defendant Hatch ascertained that" defendant bank "would release the lot in question from its mortgage * * * * so as to enable defendant Hatch to convey a clear title thereto."   We think the chancellor was justified in

construing this finding to mean that Hatch was so promised by the bank. Apparently such was the chancellor's understanding when drafting paragraph 2 of the decree. Even though the finding has not the force of a binding contract, we are unwilling to assume that the bank will not act according to the finding. It is therefore not necessary now to inquire further regarding the position of the bank in this respect. However, if its position proves to be otherwise, the plaintiff is entitled to take advantage of his right to redeem, the bill, as against this defendant, being framed with that end in view.

[10]    It is further said that the bank has been made a needless party to the suit and should be let go with its full costs. But as the bill is in part one to redeem, the mortgagee was necessarily made a party defendant, and under the ordinary rule should be allowed its costs. Yet this rule, in the discretion of the chancellor, was not followed, and need not be if the circumstances be such as to warrant a departure therefrom. *Hills* v. *Loomis,* 42 Vt. 562; *Harrigan* v. *Bacon,* 57 Vt. 644. An examination of the record shows that, while the contest has been waged on questions entirely independent of the mortgage or rights under it, the mortgagee has largely co-operated with defendant Hatch in such contest throughout, even to the extent of bringing the case to this Court on appeal and presenting the same in argument. In such circumstances we cannot say there was any abuse of discretion by the chancellor in awarding costs against the mortgagee. See *Newton* v. *American Car Sprinkler Co.,* 88 Vt. 487, 92 Atl. 831.

*Decree affirmed and cause remanded. Let a new time be fixed for the time limited in each of the several paragraphs, 2, 3, 4, 7, and 8 of said decree. Let the plaintiff recover his costs in this Court. In case defendant bank does not release its said mortgage on the said premises contracted by Hatch to the plaintiff, then as against the bank its said mortgage security thereon remains unaffected by the provisions of the decree referred to above, and the plaintiff may take such further proceedings in this case as are required to redeem said mortgage, with costs to the plaintiff.*