Crawford v. Farrington, No. 30-1-09 Wmcv (Wesley, J., Mar. 2, 2011)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

SUPERIOR COURT                                    CIVIL DIVISION
Windham Unit                                      Docket No. 30-1-09 Wmcv


Elizabeth Crawford
      Plaintiff


      v.

Patricia Farrington and Honora
Winery & Vineyard, Inc.
      Defendants


### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This matter was submitted to the Windham County Civil Unit following a bench trial on December 28 & 29, 2010 as to the issues raised by Plaintiff's complaint for judgment for breach of contract. Plaintiff was represented by Theodore C. Kramer, Esq., and Defendants were represented by Potter Stewart, Jr., Esq.

This lawsuit stems from a 2004 contract between the parties for the sale of real property located in Wilmington, Vermont. Plaintiff, Elizabeth Crawford, alleges that Defendants, Patricia Farrington and her business Honora Winery & Vineyard, Inc., have yet to fulfill a promise to construct an apartment and retail space on the property subject to the conveyance, which Plaintiff would have the right to occupy rent-free for life. Plaintiff bases her claim on a letter memorandum of understanding purporting to amend an earlier executed purchase and sale agreement. Under the new terms, Defendants were to acquire an additional parcel of land in exchange for their promise to construct the apartment to be occupied by Plaintiff.

After several years of unsuccessful urging, Plaintiff brought this action claiming that Defendants have breached their obligations to provide her with an apartment and retail space, despite numerous requests by Plaintiff and assurances from Defendants that they would perform. Plaintiff is seeking damages measured in the hundreds of thousands of dollars for past and future rental expenses, and for past and future loss of business revenue resulting from Defendants' breach.[1] Defendants dispute the existence of the elements of an enforceable contract, due to the vagueness of the purported modification.[2]

---

[1] By its decision issued April 22, 2010, the Court denied Plaintiff's Motion to Amend the Complaint to state a claim for punitive damages, concluding that such an amendment would be futile in this action sounding in contract.

[2] By its decision issued Nov.18, 2010, the Court denied Defendants' Motion for Summary Judgment based on the doctrine of merger, by which Defendants claimed that the omission from the deed of any mention of Plaintiff's expectation of life occupancy foreclosed any further reliance on the letter purporting to modify the purchase and sale agreement. The reasoning of that earlier order is unchanged by the facts found in this opinion.

## Findings of Facts

The Court makes the following findings of fact, as supported by a preponderance of the evidence:

1. Defendant Patricia Farrington owns and operates a family business known as Honora Winery & Vineyard, Inc. The goal of the business has been, generally, to create a vineyard in southern Vermont and to manufacture and sell wine.

2. Farrington came to the business with some general wine knowledge, but was not experienced in wine manufacturing, nor with the construction of wine-making facilities. She was also unfamiliar with Vermont's permitting requirements.

3. Prior to 2004, Farrington and her husband, Harry Farrington, purchased approximately 200 acres of land in Halifax, Vermont on which they have planted grape vines over a period of years, and have constructed buildings associated with the growing, pruning, harvesting and storage of grapes, and the processing of grapes into wine.

4. In mid-2004, Farrington became interested in a 2.1 acre parcel of land in Wilmington, Vermont, just west of the junction of Routes100 & 9 at the entrance to the village, and directly across the highway from the White House Inn, a notable visual landmark. A collapsed barn of some historical significance was situated on the parcel. The property was owned by Plaintiff Elizabeth Crawford. Farrington believed that the barn could be restored and the property used in conjunction with Honora Winery's Halifax facilities.

5. In July 2004, Crawford and Farrington entered into a purchase and sale agreement by which Plaintiff agreed to sell to Defendant the 2.1 acre parcel together with the remnants of the barn for $75,000. The agreement was prepared and approved between the parties' attorneys, both of whom were experienced in real estate transactions. Plaintiff was represented by Timothy O'Connor, Esq. and Defendants were represented by Stephen Phillips, Esq.

6. The purchase and sale agreement explicitly stated that an adjoining .53 acre parcel, which Plaintiff also owned, was not included in the transaction. The agreement further provided that Defendant would lease retail space in the barn to Plaintiff for one dollar a year for Plaintiff's life, to allow her to continue the retail business she had operated in the end of the barn that had remained standing. The agreement stated that the location and square footage of the retail space would be agreed between the parties soon after the execution of the sale, and that the lease would contain standard provisions and be personal to the Plaintiff, but could be renewed annually by the parties.

7. The adjacent .53 acre lot had been acquired by Crawford through a quitclaim deed for apparently modest consideration, the exact nature of which is uncertain from the evidence. The parcel has frontage on Route 9, but no on-site water or electricity services.

8. After signing the original agreement, Crawford and Farrington entered into further discussions concerning the disposition of the adjacent .53 acre parcel, initially without the assistance of counsel. Farrington had concluded that the joinder of the two parcels was likely advantageous. Sensing Crawford's reluctance to divest herself completely from her connection to her former holdings, Farrington offered Crawford the opportunity to live in the barn in an apartment that would be constructed by her and Honora, to be occupied rent-free by Crawford for the rest of her life.

9. Subsequent to these discussions between the parties, Atty. Phillips sent Atty. O'Connor a letter which outlined his understanding of the new terms to which their clients had agreed, specifically addressing the .53 acre parcel. The letter memorandum provided that:

"[t]he new agreement will call for Bette Crawford to sell both parcels, including the .53 acre parcel…the price will remain the same…Patricia Farrington will arrange for an apartment to be constructed (at her earliest convenience) in the structure for the benefit of Bette Crawford for her sole use for her lifetime. No rent will be charged, although Bette will need to pay for her own utility costs and insure her own belongings. We should probably have a lease drawn up at the time of occupancy just to clarify the arrangement."

10. The foregoing represents the entire substance of the parties' written representations concerning the disposition of the .53 acre parcel. The letter establishes no start date for construction, no expected time of occupancy, no further definition of the phrase "at her earliest convenience", no identification of the configuration of the apartment or any amenities or its location in the larger reconstructed barn, and no further elaboration of possible lease terms other than the reference to Plaintiff's responsibility for "utility costs" and to "insure her own belongings".

11. The memorandum was prepared and signed by Atty. Phillips, dated August 19, 2004. Plaintiff signed it on August 20, 2004, indicating her acceptance of the modifications to the purchase and sale agreement. Atty. O'Connor returned the acceptance executed by his client to Attorney Phillips on August 23, 2004.

12. After the letter memorandum was exchanged between the attorneys, and prior to the closing, Elizabeth Crawford and Patricia Farrington had no further discussions between themselves regarding their intentions, nor as to the meaning of any terms left ambiguous by the letter. Likewise, no discussion between Attys. O'Connor and Phillips ever settled the uncertainties inherent in the language of the letter. [3]

13. Though not stated in the agreement, Plaintiff and Atty. O'Connor believed that the apartment would be constructed on the second floor of the barn in an area that had previously been used as primitive sleeping quarters, and would be approximately 900 square feet in size. The basis for this understanding is unclear from the evidence, although it is consistent with plans that Defendants later submitted in connection with permit applications.

---

[3] Attorney O'Connor testified at trial, while Attorney Phillips did not.

3

14.  Plaintiff further testified to her belief that within a year she would have an apartment in the barn structure in which to live.  Attorney O'Connor believed the apartment would be provided within 8 to 10 months, or as soon as the winter season ended and outdoor construction could begin.  However, to the extent there were general discussions about when permit applications would be sought - understood to be "promptly" - there were no discussions nor mutual understanding reached as to when occupancy was to occur.

15.  Defendant Farrington does not dispute that the letter created the expectation that she was to provide Plaintiff an apartment and retail space, rent-free, for her lifetime.  However, by Defendant's testimony, the term "at her earliest convenience" was used because Farrington needed flexibility with respect to her business plans.  Indeed, Farrington would not have bound herself to a fixed date due to the uncertainties surrounding the project and permit applications.  Any promise Defendant made was, in her view, subject to her business judgment and the dictates and vagaries of the permitting process.

16.  On the other hand, Plaintiff acknowledged not having carefully read or understood the term "at her earliest convenience", especially as it affected Defendant Farrington's exercise of judgment as to how the creation of the apartment would be coordinated with the renovation of the barn, and its function within the business plan of Honora Winery.

17.  On September 9, 2004, the parties closed on the properties in question, per their purchase and sale agreement as modified. Plaintiff signed a warranty deed conveying both the 2.1 acre parcel and the .53 acre parcel to Defendant Farrington and/or her nominee.  As to the amount remaining to be paid after closing, Defendant Honora Winery signed a note and mortgage deed to pay Plaintiff $50,000 over five years with interest, which has since been paid in full.

18.  The deed was prepared by Atty. O'Connor and made no reference to any apartment or retail space reserved by Plaintiff, nor any reference to a future lease to be negotiated and drawn up between the parties.  The only written documentation of the parties' agreement that an apartment would be constructed for the benefit of Plaintiff during her lifetime is confined to the letter memorandum exchanged between the attorneys after it was accepted by Plaintiff.

19.  In November of 2004, an article appeared in the Deerfield Valley News regarding the barn transaction.  The article referenced the arrangement between the Plaintiff and Defendant Farrington concerning the living and retail space offered to the Plaintiff.  Farrington is quoted as saying that the reason she made the offer of the lifetime apartment to Plaintiff was because Plaintiff was expressing reluctance to sell the property due to its sentimental value to her, and that the opportunity to remain on the property rent-free for the remainder of her life was favorable to Crawford.  Farrington is also quoted as saying that the apartment would be one of the first areas of the building to be worked on, and that she hoped to have the space completed within 12 months, or 24 months at the latest.

20.  While Defendant Farrington does not dispute the statements attributed to her in the newspaper account, the representations made more than four months after the letter

4

memorandum do not reflect any agreement actually expressed between the parties; in any event, they speak of Defendant's "hopes" as distinguished from any prior mutual "promises".

21. Between September 21, 2004 and August 23, 2006, Defendant Farrington applied for and obtained several permits in relation to the Wilmington barn property. These included a Wastewater and Potable Water Supply Permit with the State of Vermont, a Vermont State Construction Permit, a Vermont State Sprinkler Permit, various State electrical approvals, and a Town of Wilmington conditional use permit. All the permits were obtained in reliance on plans showing that the barn would have a mixed use, including space for Honora's retail operations, wine manufacturing, as well as a residential apartment and retail space for Plaintiff Crawford.

22. Despite offering to pay for the extension of necessary infrastructure, which would have included service to other nearby users – including the Deerfield Valley Health Clinic - Defendants were denied a permit to access municipal water and sewer from the Town of Wilmington. This was a significant set-back with respect to Defendants' expectations to use the barn for wine manufacturing. Further, the requirement of a sprinkler system, triggered by the inclusion of the residential space within the larger commercial structure, raised significant questions as to whether on-site sewer and water systems would be adequate to Defendants' plans for the multiple uses of the barn.

23. On March 16, 2005, Honora was granted a jurisdictional opinion by the District Environmental Administrator ruling that the Wilmington barn project was exempt from Act 250 permitting requirements. The key to this ruling was the conclusion, based on Honora's representations, that wine produced and sold on the premises would be the agricultural product of grapes grown on Vermont lands controlled by Honora. At that time, and based on the same rationale, Honora's Halifax site was similarly exempt from Act 250 jurisdiction.

24. However, by mid-2006, a number of circumstances transpired to bring Defendants' operations within the scope of Act 250 regulation, resulting in significant additional permitting requirements, reconsideration of Honora's business plan, and a pronounced delay in the Wilmington barn project.

25. In an effort to promote its activities, Honora sponsored the Art on the Mountain charity festival, but unexpectedly discovered that aspects of this endeavor made the entire enterprise subject to Act 250 scrutiny. Furthermore, Honora acknowledged that, beginning in December 2005, it had been forced to contract for the delivery of grapes from California, since the harvest of Vermont-grown grapes for wine-making purposes had proved insufficient both as to quality and quantity. This reliance on out-of-state crops resulted in the forfeiture of the agricultural exemption. The District Environmental Commission asserted Act 250 jurisdiction in June 2006.

26. The resulting Act 250 proceedings proved lengthy and contentious. Defendants were compelled to engage consulting and engineering services in response to opposition by neighbors. Ultimately, Defendants obtained a land use permit on April 29, 2008. From Defendants' perspective, the permit included significant restrictions which limited the ambitious scope of Honora's plans; wine production would be limited to the Halifax site, and no wine could be sold

5

as part of a general retail operation, only to those who participated in scheduled tours of the winery.

27. The Act 250 proceedings focused on Honora's Halifax operations and facilities. However, acting on the advice of their legal and land use consultants, Defendants had "buttoned-up" the Wilmington barn project, and did not seek specific permits in Case 2W1216-1 for the use of the barn space. Thus, the proceedings which culminated in the April 2008 permit did not address Honora's once-planned use of the barn. Nonetheless, due to the proximity of the Wilmington and Halifax properties, and as they are both in common ownership of Defendants and dedicated to the "larger undertaking" of grape and wine production and commerce, Defendants were advised, consistently with Environmental Board Rules, Article 1, Definitions 2.2(f) and Land Use Rules Section A 2.2(c)(5), that use of the Wilmington property would also be subject to Act 250 jurisdiction as "involved lands". Under the circumstances, the uncertain impact of the outcome of the Act 250 proceedings on Honora's business operations forced Defendants to reconsider how they would be able to make use of the Wilmington barn, resulting in a delay extending until the present in completing the renovations and seeking permits for its possible use.

28. Beginning in June 2006, Defendants undertook the demolition of unsalvageable sections of the Wilmington barn, and then framed up and restored the shell of the structure. The outer work is complete, but the transition from shell to occupancy-ready status has been put on hold by Defendants, pending determination and permitting of a viable overall use for the substantial proportion of the space. Excluding the approximate amount of space Defendants expected to dedicate to Plaintiff's occupancy as a dwelling and for retail purposes, slightly less than 1,500 sq. ft., the use of the remaining 15,500 sq. ft of the barn's interior remains undetermined and subject to further land use regulatory proceedings.

29. Defendants' initial expectation that the Wilmington barn would be used for the production and retail sale of Honora's wine have been rendered dubious by the assertion of Act 250 jurisdiction, and the outcome of the proceedings as to the Halifax operations. Thus, Defendants have attempted to market the space in the barn for other purposes, such as a culinary school. Significant efforts have been expended to this end, including overtures to a number of prospective commercial tenants, though these efforts have been unavailing to date.

30. Defendants' State Construction Permit required the issuance of a Certificate of Occupancy prior to the commencement of any use of the renovated barn. The Certificate cannot be issued pending the completion of all interior renovations, and a final inspection of the systems associated with permitted uses. Defendants could not have obtained the Certificate of Occupancy to allow the use of only a portion of the building, despite Plaintiff's demand that the apartment should have been constructed and made ready for her occupancy well before she commenced this lawsuit.

31. Since the purchase of the barn property, Defendants have purchased several more parcels of real estate in connection with their winemaking operations. These properties mostly consist of parcels of land adjacent to the Halifax and Wilmington properties, purchased to facilitate possible expansion of operations at either location. The purchases have totaled more

6

than $800,000. Defendants have used cash to meet a significant percentage of the overall purchase price for these properties.

32. Despite the substantial investments made by Defendants, Honora has never made a profit, operating each year of its existence while incurring substantial losses. The renovations, improvements, additions to real property, and financing of daily operations including the cost of regulatory proceedings, have depended on sustained contributions from Defendant Patricia Farrington's personal resources. These derive principally from her ownership of two "gentlemen's clubs" in Stamford, Connecticut. Defendant's joint tax returns with her husband show the following: i) in 2005, gross wages of $371,871, taxable income of $201,145, refund of $27,668; ii) in 2006, gross wages of $400,651, taxable income of $246,743, refund of $34,450; iii) in 2007, gross wages of $431,499, taxable income of $115,543, refund of $65,839; iv) in 2008, gross wages of $472,172, taxable income of $67,839, refund of $81,933; v) in 2009, gross wages of $452,633, taxable income of $95,133, refund of $79,282.

33. Prior to, and since the conveyance of the barn property, Plaintiff has occupied rented apartments in the Wilmington area. From October 2005 until the end of December 2010, she has expended $55,725 in rent. In the absence of the apartment space which she expected to occupy in the renovated barn, Plaintiff will likely continue to incur rental costs for her lifetime, stipulated as 17 years based on actuarial tables.

34. In April 2005, Plaintiff Crawford was diagnosed with lung cancer. The cancer is now in remission, which has continued beyond the five year mark considered significant in predicting relapse. Prior to the cancer diagnosis, using a small portion of the barn which remained standing, Plaintiff operated a seasonal and occasional business called "Cowlectibles", consisting of sales of "stuff collected on Cape Cod and other stuff friends had given". She acknowledged that this business never was "a big income thing". No business records from the business were submitted into evidence, though Plaintiff estimated average gross revenues of approximately $5,000 per year, claimed to have resulted in $2,500 net income to her after commissions. Plaintiff has not operated the business since the cancer diagnosis. The evidence is insufficient to demonstrate lost profits from this sporadic hobby enterprise.

35. In December 2007, following a number of earlier inquiries, Plaintiff wrote Defendant Farrington seeking clarification as to when she might expect occupancy of the apartment specified by the letter memorandum. Plaintiff reminded Defendant of her cancer condition, stating that the expenses associated with treatment had been burdensome and difficult to meet while still paying rent. Subsequent negotiations, including the involvement of prior and present counsel, proved unavailing.

36. Defendants are currently making beneficial use of the .53 acre lot, which is the site for an electrical box for the barn. The acquisition of the lot also enabled Defendants to meet setback requirements under the Wilmington zoning ordinance when applying for a conditional use permit with the Wilmington Development Board. Ownership in Defendants' hands also has eliminated the risk that the parcel would be used in some offensive fashion by another owner. As Defendant Farrington acknowledged in her trial testimony, having the .53 acre provides her

with "flexibility" when considering the still-uncertain future uses of her Wilmington land holdings.

36. William Palumbo, with 20 years experience as a licensed real estate appraiser in the Wilmington area, testified that the .53 acre parcel had a fair market value of $50,000 at the time of its conveyance to Defendants. Mr. Palumbo based his assessment on the relatively better state of the real estate market in 2004, a parcel of approximately 1 acre in the vicinity of the subject land that sold "in the $50,000 range" in 2004, the parcel's frontage on Rte. 9 "which is a high traffic road", and the deeded access to water from an off-site source. Palumbo's appraisal was unsupported by a written evaluation. He acknowledged that there were few comparable sales of property which could be used to support his appraisal, although he disputed Defendants' attempts to derive a per/acre formula from sales in 2004 of substantially larger parcels. Beyond efforts on cross-examination to discredit the basis for Palumbo's opinion, Defendants offered no expert appraisal in rebuttal. The Court accepts the testimony establishing a fair market value for the .53 acre parcel as $50,000 at the time of the conveyance between the parties, relying on Palumbo's experience and professional judgment.

## Conclusions of Law

*A. Recovery in Contract*

This case presents a dispiriting accumulation of circumstance by which two well-meaning parties, each represented by counsel highly regarded as real estate practitioners, entered upon a transaction for the conveyance of real property which became subject to vagaries and contingencies not well-understood by either party. The respective roles of counsel in contributing to the misunderstandings at the heart of the dispute seem destined to remain inadequately explained. Nevertheless, fundamental principles of contract formation compel the conclusion that, as to Plaintiff's expectation that Defendants would construct an apartment for her lifelong occupancy rent-free, the parties never reached a meeting of the minds as to all the essential terms of such an agreement to make it enforceable in this lawsuit.

For the formation of a binding contract, there must be mutual assent or a meeting of the minds on all of the essential elements or terms of an arrangement. 17A Am. Jur. 2d *Contracts* § 30. To render a contract enforceable, courts must find that the parties agreed to the same terms and conditions, and intended to be bound by those terms and conditions. See *Starr Farm Beach Campowners Ass'n., Inc. v. Boylan*, 174 Vt. 503, 505 (2002). Indeed, courts will not enforce a contract that is vague, indefinite, and ambiguous. *Evarts v. Forte*, 135 Vt. 306, 310 (1977) (vague description of real property to be conveyed, at odds with physical inspection, did not support enforceable purchase and sale agreement). Further, while a binding agreement need not contain each and every contractual term, it must nevertheless contain all material and essential terms. *Quenneville v. Buttolph* 175 Vt. 444, 452 (2003) (indefinite terms of financing clause as to interest rate, amount of payments and security precluded prospective purchasers' reliance on purchase and sale agreement for a farm). An instrument that purports to be a complete contract but does not contain the substantial terms of a complete contract is ineffective as a legal document. *Id.* (citation omitted). Accordingly, vagueness and indefiniteness as to any essential contract term can preclude formation.

Based on the facts found above, the Court cannot conclude that there was a meeting of the minds sufficient to form a binding contract between Plaintiff and Defendants. The letter memorandum which purported to establish Defendants' duty to construct an apartment for Plaintiff's benefit was replete with uncertainties. As found above, the letter "establishes no start date for construction, no expected time of occupancy, no further definition of the phrase 'at her earliest convenience', no identification of the configuration or amenities of the apartment or its location in the larger reconstructed barn, and no further elaboration of possible lease terms other than the reference to Plaintiff's responsibility for 'utility costs' and to 'insure her own belongings'".

No meaningful discussions ever took place between or amongst the parties, their attorneys, or any other pertinent individuals at or before the time of closing, which addressed these imperfect terms of the letter memorandum. The testimony regarding different "understandings" reached by each party, or Atty. O'Connor, was unsupported by evidence of circumstances demonstrating that any such assumption was mutual, or could be found to have constituted a simultaneous expectation of each party to be bound by such understanding.

As noted, the addendum to the purchase and sales agreement is deficient as to a number of material terms which inform the nature of Defendants' duty to perform. By its sparse terms, the addendum states only that occupancy was to begin after Defendant Farrington arranges "for an apartment to be constructed (at her earliest convenience) in the structure for the benefit of Elizabeth Crawford for her sole use for her lifetime." The letter memorandum represents a paltry pass at creating a construction contract, without any description of what was to be constructed except "an apartment". How big? How many rooms? What size? Where located in the larger structure? What other amenities and fixtures? These questions cannot be answered by reference to any writing or evidence of discussion between the parties. Each side apparently was initially content to rely on the other's good faith that some common set of expectations would emerge during performance that would satisfy both, but the peril of contrary developments was patent from the outset. That Defendants later attempted to address certain of these unspecified construction elements, by the submission of plans while seeking construction permits, adds nothing to the contract formation analysis. There is no evidence that such plans had been discussed before the closing, nor that the parties subsequently agreed that Defendants' unilateral proposals to satisfy permitting requirements had been accepted by Plaintiff as "the apartment" she expected to receive. *Vaughan v. Tetzlaff*, 141 Vt. 150, 154 (1982)(the time for measuring a meeting of the minds is at the point of agreement, not the time of performance); *Reynolds v. Sullivan*, 136 Vt. 1,3 (1978)("If essential terms are left for future agreement, no legal obligation is created until such future agreement"); see also, *Starr Farm Beach Campowners Ass'n Inc. v. Boylan*, 174 Vt. at 505 (2002) (mere expression of intention or general willingness to do something does not amount to an offer).

In addition to the omission of any construction specifications, the addendum makes reference to the need to "probably have a lease drawn up at the time of occupancy just to clarify the arrangement." Since the parties were attempting to include a rent-free lifetime lease as a component of the consideration for Plaintiff's conveyance of the .53 acre parcel, plainly the terms of the lease were material; i.e. access to the apartment and/or other parts of the structure,

9

obligations for mutual quiet enjoyment, provisions for guests, parking accommodations, expectations as to trash and/or snow removal, grounds for termination apart from non-payment of rent, etc. Having left so many details to be determined in anticipation of future mutual agreements, the parties proceeded to closing without a contract that would survive it, in the absence of evidence that some later agreement arose that supplied the missing terms. See *Reynolds*, 136 Vt. at 3 ("It would be an impossibility to enforce a preliminary option agreement … because of its vagueness and uncertainty.").

The omissions and ambiguities just discussed are ample evidence of a lack of mutual assent. Yet, the particular omission with principal responsibility for this dispute lies with its failure to specify a time for performance. As Plaintiff acknowledges in her proposed conclusions of law, '[t]his is an imperfect clause as it provides no specific date". Nonetheless, Plaintiff relies on authority that when time for performance is omitted or unclear, the uncertainty will rarely defeat a contract; rather, the law typically implies a duty to perform within a reasonable time. *Farmer's Feed & Grain Co. v. Longway*, 103 Vt. 327, 329 (1931). "What is a reasonable time in a given case depends upon the circumstances, and is usually a question of fact." *Id.* (internal citations omitted).

Since the uncertainty as to when Defendants were bound to afford occupancy to Plaintiff is but one of a host of missing material terms, Plaintiff's resort to the law to compel the construction of an apartment "within a reasonable time" was doomed from the outset. Lack of mutuality was apparent everywhere. Even so, as the circumstances here make clear, the *Farmer's Feed & Grain* maxim does not supply a ready fit to impose a performance obligation upon Defendants. The parties did not overlook the time for performance, and the uncertainty as to when performance would occur was not wholly untethered from other contractual considerations. Rather, the parties specifically acknowledged that Defendant would make arrangements for the construction of the apartment "at her earliest convenience". Since this term afforded Defendant almost unbridled latitude, it surely ought to have caught the attention of the attorneys and the parties as potentially problematic. Yet, Plaintiff admits that she really did not become aware of how much subjective discretion had been left with Defendant until she became deeply involved in this suit. As for Defendant, she insists that any demand for less discretion would have been unacceptable, since the barn project was fraught with so many uncertainties. Indeed, as events unfurled, even with Defendant's cautious reservation of the right to proceed "at her earliest convenience", it is apparent that she was barely prepared for the complexities of the barn project, especially when considered in the context of Honora's other related operations and their triggering effect on Act 250 jurisdiction. While Plaintiff now complains that none of these regulatory requirements, and the delays associated with compliance, had been the subject of a permitting contingency in the purchase and sale contracts, this argument overlooks Defendants' insistence that the "earliest convenience" clause encompassed exactly that function.

In sum, when considered within the context of the differing expectations of the parties as established by the evidence, the Court concludes that Defendant's reservation of the right to perform at her convenience was a material aspect of the attempted agreement. While Plaintiff laments that *she* never would have agreed if she had known her occupancy might be so long delayed, Defendant maintains that any more limiting restriction would have precluded any agreement on *her* part. From her point of view, Plaintiff claims justification in believing that

Defendant's "earliest convenience" should have been satisfied at the latest by the time this suit was filed. On the other hand, Defendant's experience with permitting complications and associated delays subsequent to the closing is but another cautionary tale in the growing chronicle told by those who embark upon major land use development in Vermont innocent of the regulatory environment, and without careful planning and preparation. Having been caught in that labyrinth, however, there is just as much justification, from Defendant's point of view, for her to maintain that the time of "her earliest convenience" had become unavoidably extended. Here, the failure to consider all the contingencies that might affect Defendant's "convenience" – and the scope of the barn project alone should have made the need for such consideration obvious, to say nothing about the proximity of other "involved land", the potential complications of which experienced counsel ought to have foreseen – resulted in each party's reliance on a vaguely defined term which was reasonably susceptible to two very different interpretations. The resulting state of affairs stemmed from a quintessential absence of a meeting of the minds.[4]

*B. Recovery Under a Theory of Quantum Meruit*

In its decision issued Nov. 18, 2010, denying Defendants' Motion for Summary Judgment, the Court suggested that "some questions regarding the respective rights of the parties might elude determination by reference to the terms of the contract, yet require consideration of equitable principles such as *quantum meruit*. See, e.g. *Conley v. Hatch*, 97 Vt. 484 (1924)(examining the equities supporting promissory estoppel in lieu of a suit in *quantum meruit* for the value of services rendered)." While the Court encouraged further development of legal and factual considerations associated with such possible remedies, the parties have devoted little attention to these issues in their post-trial memoranda. Plaintiff has made no specific request for relief under an alternative theory from her claim for breach of contract, although Defendants acknowledge that their acceptance and retention of the .53 acre parcel, without having constructed the apartment referenced in the addendum to the purchase and sale agreement, implicates consideration of a further equitable remedy.

Under the circumstances described by the findings, and notwithstanding the absence of a binding contract, the Court concludes that Plaintiff is entitled to a recovery under a theory of *quantum meruit*. The right to recover in *quantum meruit* does not grow out of contractual obligations established by mutual agreement, but is independent of any contract, or lack thereof, and is based upon the promise implied by law to make fair compensation for beneficial services

---

[4] The facts here are readily distinguishable from *Cushman v. Outwater,* 121 Vt. 426(1960), the case on which Plaintiff places great reliance. The Vermont Supreme Court upheld the Chancery Court's award of money damages to Plaintiff, after her son dispossessed her from the quarters she had occupied in the house which he and his wife had constructed. Plaintiff had provided a significant portion of the funds used by her son toward the purchase of a lot and the construction of a house, upon the mutual understanding that she would have lifelong occupancy of her portion of the house whenever she visited Vermont. Thereafter, the lot was purchased and the house was constructed to include a separate kitchen and living quarters for Plaintiff, which she occupied for three years when not in Florida, before her son and his wife moved her belongings into storage and refused entry. The Supreme Court found no requirement of "ceremonial formulation" of the contract terms, since the parties' agreement was easily implied from the facts surrounding the transaction. Here, by contrast, the multiple uncertainties as to the nature of the "apartment" referenced in the letter memorandum cannot be ascertained by reference to the specifications of a residential space which was actually constructed and occupied for several years, as in *Cushman;* rather, everything about the parties' expectations regarding the apartment remains unspecified, including and especially when it was to be constructed and occupied.

rendered and knowingly accepted. 17A Am. Jur. 2d *Contracts* § 200. Here, a benefit was bestowed upon Defendants by virtue of Plaintiff's conveyance of the .53 acre parcel, which merged upon the conveyance with the barn lot, and cannot be returned to Plaintiff. Because the contemplated consideration for the conveyance – the construction of an apartment, and its lifelong occupancy by Plaintiff – failed due to the indefinite nature of its terms, Plaintiff has received nothing of value in return for the conveyance. Thus, the Court must determine the value of this benefit and require Defendants to compensate Plaintiff for the conveyance, in order to accomplish equity and avoid unjust enrichment.

Based on the testimony of Plaintiff's expert witness, William Palumbo, a licensed real estate appraiser, the Court has determined that the fair market value of the .53 acre parcel was $50,000 at the time of Plaintiff's conveyance to Defendants. Thus, as an equitable remedy, the Court will order Defendants to pay this amount to Plaintiff, plus interest accruing from the time of the closing.

**WHEREFORE** it is hereby **ORDERED:**

Plaintiff's complaint for breach of contract is **DISMISSED** for failure to prove the existence of a contract. Treating the complaint as including an alternative request for an equitable remedy in quasi-contract, Plaintiff is **GRANTED JUDGMENT AGAINST DEFENDANTS** in the sum of $50,000 plus interest, accruing from the time of the execution of the underlying transaction, at the statutory rate, plus court costs.

Dated at Newfane this 2nd day of March, 2011.

_____
John P. Wesley
Superior Court Judge

12